Our next case is In Re S.S.Body Armor. Good morning, Mr. Sessor. Good morning, Your Honors. May it please the Court, Gary Sessor, Carter, Ledger, and Milburn, attorneys for Appellants D. David Cohen and Carter, Ledger, and Milburn, L.O.P. Mr. Sessor, I want to admit my lack of clarity with respect to this case. Okay. But at the end of the day, are we here prematurely? And what I mean by that is if the bankruptcy court has not ruled definitively with respect to the fees or lack thereof that your client is entitled to, what are we doing here? Okay. The answer is that the fee award before the court now, the 2015 fee award, denied us fees unless in the future Fees are recovered. There would be a recovery under SOX 304. But isn't it true that the bankruptcy court hasn't made a final determination as to the fee issue? We have not yet embarked on discovery relating to the settlement, the $142 million global settlement, which will require discovery into the role of SOX 304 into it. And I'll explain why this is not premature. Because if we go through, if the ruling from 2015 remains unchallenged, it is the operative ruling from which we judge fees. And at the end of the process of discovery and an evidentiary hearing in which my adversaries have announced their intent to block discovery into the settlement through the mediation privilege, I am unable to establish that funds actually flowed from the SOX 304 recovery to the debtor. Then I get zero fees. And my appeal is on an issue of fact on a clearly erroneous standard. Isn't a 2015 settlement that you were granted a contingent fee in? I'm calling it contingent, contingent on the recovery. But isn't that settlement which you're appealing from? Hasn't the bankruptcy court moved on to that as a result of the death and the vacation of the conviction and the criminal restitution to now a 2018 settlement? Haven't they moved on from 2015 to 2018? Well, there is another settlement from 2018. But that hasn't changed my situation. Yeah, but you're not going to be able to recover. How are you going to be able to recover? Let me pose the question. How are you going to be able to recover under the 2015 settlement if that settlement doesn't distribute the money? Because that's the operative order relating to our fees. I mean, in other words, I don't think we have. You're not the operative order. You're objecting to the structure of the bankruptcy or the restrictions, as it were, the bankruptcy court put on your potential fee, right? Yes, our objection is. And the bankruptcy court hasn't ruled on that ultimately, correct? As to how much, if anything, you're getting. That's an open question in the bankruptcy court, yes or no. Is that a yes or no? It's a yes. It's a yes, right? Yes. Yes. But the situation we're in is that if I am unable to establish specifically that funds came from SOX 304, and this was a global settlement involving other claims, then we are entitled to zero. And what that means is that we get zero as an objector for raising a meritorious objection that vindicated the public interest. Going back to my question again, just to help me clarify this. So your position is if you don't get this 2015 order reversed, you're not going to be able to raise a similar argument in the future in the bankruptcy court in the final settlement? That's absolutely correct. Okay. In other words, I am stuck with an order that says as a successful objector who in 2010 vindicated the public interest, saved $186 million claim, you are entitled to nothing unless you clear this further hurdle of showing that funds went from the SOX 304 recovery, which they contest. And they structured the settlement, the new settlement, specifically to disguise the role of SOX 304 in it. So I have to contest with that. I have to contest with the mediation privilege. And our position here today is we earned our fee in 2010. And you're not arguing you're entitled to a fee based on a common fund theory? No, we may at some point. You're asking for a fee based on being an objector to the indemnification in the original class action, right? Yes, that's correct. If the penalty had been paid to the SEC and been indemnified, then it would be the indemnification. Well, if the fact that that wasn't a Mr. Brooks died, he didn't pay the penalty, right? His estate was the defendant. Did they pay the penalty? Yes. Well, a judgment was entered in the SEC action that provides as follows. Is that December 18 from the State of Florida, the District Court of Florida? Yes. A $142 million judgment was entered in the SEC action and provided that it would be deemed satisfied by the release of funds that had been restrained in the Eastern District of New York. In the civil forfeiture? Well, actually, the funds were originally restrained in the criminal proceeding. But they're now vacated. As a result of death. Right. The civil forfeiture procedure proceeding at that point was at the pleading stage. The SOX 304 claim was at the summary judgment stage at the time the settlement was reached, the new settlement was reached at the end of 2017. But isn't it still possible for the bankruptcy court to award you fees? Only under that order, only if a determination is made that funds came. It's not impossible. So let's assume the bankruptcy court does make that determination and does award you fees. That's possible, right? That's possible. But it's also possible that the bankruptcy court would make a finding of fact saying, as they contend, saying, oh, I don't think any of these funds came from SOX 304. They came from the civil asset forfeiture in the Eastern District. And therefore, the order is explicit. The last line of the order is explicit. For the avoidance of doubt, unless funds come from SOX 304, you're entitled to no fee. Which means we're entitled to no fee for vindicating the public interest, relieving the public company of $186 million liability. In essence, they're telling you you have to recover a fee based on a common fund theory. From that particular claim. And it would not be open to me, after the bankruptcy court rules, to come before the court and say we were entitled to a fee regardless. We earned our fee in 2010 when we, in an issue of first impression, pursued a meritorious objection. Accepting everything that you're saying, and I'm not, no reason to doubt what you're saying. You know the record and you know what happened here in this case. Isn't the problem, one of the problems I think we have here is we're in a position of evaluating whether or not the bankruptcy judge, the bankruptcy court, abused its discretion in deciding that the fee that you should get should be contingent on being able to trace your objection to a specific fund. If we have to review that based on an abuse of discretion standard, I know you're shaking your head so you can give us a two-part answer. If we have to review it under an abuse of discretion standard, how can we say that the bankruptcy court abused its discretion? Because what's before us today is not an abuse of discretion standard. A review of the procedures and the standards that are applied to a fee application is a question of law that's reviewed de novo. That's the Valerino case from 2016, Valerino versus Hoover, which was citing Lochner versus University of Pittsburgh. The standards and procedures, and what's clear in this case is that the bankruptcy court did not take into account whatsoever our serving the public interest. In other words, the only thing that counted in the bankruptcy court, perhaps not unexpectedly, is money in the door that benefits the debtor. And the ruling essentially says, despite your successful objection in the Second Circuit, you are entitled to nothing unless there is a recovery on this specific claim, which, by the way, you have no control over. And what you did was prevent money from going out instead of getting money to come in. Is that what your appeal and the determination of the Second Circuit was, to prevent money from going out of the estate rather than money coming in? Well, the Second Circuit decision, which overturned, vacated a settlement that had been approved by the Eastern District of New York, which is not an everyday occurrence, they said the part of that settlement, an integral part of the settlement, was the release and the indemnification of the former CEO from his $186 million liability under Section 304 of Sarbanes-Oxley. We argued that that's illegal and that it's contrary to public policy. We prevailed on that. And that prevented company money going out of the door to indemnify Mr. Brooks rather than having money come in. In the event that there was a recovery under SOX 304, which is a strict liability statute, so they had a $186 million claim, strict liability claim, against someone who was a billionaire at that time.  If he had to pay that claim, the company would be obligated to indemnify him. So essentially what you're saying is correct, except the SEC took the position, we're not going to bother pursuing a claim if he's not going to pay it and he's going to be indemnified. And that was a matter of actual practice before our decision in 2010, that CEOs and CFOs were using the occasion of class actions to insulate themselves from the liability under SOX 304. So this was a significant precedent. Getting back to my question. Yes. I'm trying to get this standard. You're saying we have to review the bankruptcy court's decision on your fee de novo because it's a question of law. Which case says that someone who comes before a bankruptcy court as a, I'm going to call you a successful objector, which case says a successful objector doesn't have to point to a specific fund from which his fee will be paid? Well, I think there are cases cited in our brief which people are awarded fees for improving the form of a notice. Which case from the Third Circuit of the Supreme Court can you cite to? I'll check the briefs, but we cited a number of cases where objections were overruled. And the and I believe some are from the Third Circuit where objections were overruled, but fees were awarded because they made it a more adversarial process. There was in the settlement in our case back in 2008, which was the combined class action derivative settlement. An objector was awarded. You have some rebuttal time. You can cite that case to us. So what you want to do is rewrite the order, striking the language that is contingent on monetary contributions to the fund. That you're entitled to an award in light of your Second Circuit opinion. Yes. Hard stop. Hard stop and the amount to be determined. By the bank. Yeah, but. No contingency. No contingency relating. You have to prove a contribution to the money. Right, because to do that, that's it. That's correct. Thank you. See you on rebuttal. Good morning. May it please the Court. Alan Kornfeld on behalf of AFTA Lease, the Reorganized Debtor, and the Recovery Trust. Good morning, sir. Let me turn to a couple of questions that the panel asked. First, with respect to the common fund. There is no case where this court held or the Supreme Court held that an objector who seeks to recover from a common fund can recover from a hypothetical common fund. A common fund that hasn't yet come into existence. Every common fund case, whether it be in the Third Circuit. Everybody's saying this isn't a common fund case. Well, that's not what they said when they made their fee application to the Bankruptcy Court. When they made their fee application to the Bankruptcy Court in 2015, they said this is a common fund case. We're entitled to 1% of a $186 billion recovery. Therefore, we get a fee of 1.86. They made an application based on a common fund case. The Bankruptcy Court's ruling that they don't get to recover from a hypothetical common fund was based on that application. Where at the time in 2015, and frankly to this day, there was no common fund created by the SOX 304 litigation. Isn't Mr. Sessor saying that we weren't proposing a hypothetical common fund case? We were just using that settlement as a basis in which to calculate the amount of money we were owed. And what we got was a determination that you're entitled to an amount of money, but show that this money came in as a result of your SOX effort. I think the panel's questions highlighted the problem with Mr. Sessor's theory. He's trying to fuse two settlements. There's a 2015 settlement upon which he based his fee. The 2015 settlement was basically a sharing arrangement between a securities class action group and a debtor who could fight over money that would be at that time obtained in connection with criminal restitution and then subsequently after Brooks died in connection with civil forfeiture. Or they could reach a sharing arrangement, which they did. And the sharing arrangement was the class and the debtor's share of 50-50 up to a certain amount, and then they're at 63-37. And that was the settlement of 2015. There was no money to be divided at that time. There was a hope and prayer that there would be money. So Mr. Sessor comes into court after that hope and prayer and says, I want a fee based on that $186 billion common fund. And there just wasn't a $186 billion common fund then. There was a SOX 304 claim by SEC in Florida, which at the time had been state. SOX 304 claim may have gotten a judgment for $186 billion, but we all know once you get a judgment, you've got to go collect the judgment. And there was no judgment. There was no collection of the judgment. And Mr. Brooks, who had had the pleasure of having the FBI do a forensic analysis of every petty he had, and the government in the Eastern District of New York seized all the assets that the FBI found. Nobody could find any other money other than $186 billion approximately that the FBI and the Eastern District of New York U.S. attorneys had seized. So the SEC action in 2015, here's where we are. We have an action. It has a claim. It's staged. No judgment. And if they get a judgment, enormously uncertain how they will collect the judgment. There are no available funds other than the restrained funds. And that was true back in 2050. It's also true today. But what Mr. Sessor and his client was looking for in 2050, which is the order we're here on today, was a share of a common fund. They go to the bankruptcy court and they say, Judge Sanchi, we want, based on all the common fund cases they cited, we want 1% of that fund. That's $1,000,000.86. We think that's a fair number. We did a Lodestar crosscheck. The Lodestar crosscheck is our fees are $550,000. We're asking for 1.86 based on the common fund theory. Applying the 3.38 multiple, which under Third Circuit guidance is a little high, but it's within the range. You get to the billion .186. So, Judge Sanchi, give us the billion .186. And Judge Sanchi says, basically, he asked the same question this panel asked. Do you have a fund or do you have a hypothesis? And the answer at that time was, there's a hypothetical fund. There is no fund. Therefore, Judge Sanchi says, in the exercise of his discretion, the only thing he can say, if you get a fund, I think you deserve a fee based on that fund. Is there a fund now? There is no fund due to the SEC action, but Mr. Sesser would disagree with that. When did Mr. Brooks die? Mr. Brooks died in 2000, about two years ago, two or three years ago. Before he died. This was before. And this was at the point where he might get indemnified. So that there would have been a fund. Not exactly. This was at the point before he died. But we, as the debtor, we take over the case on April 14, 2010. We filed for bankruptcy. Brooks is out of the picture. The board is replaced. We have a chief restructuring officer who is in court here today. The chief restructuring officer, Scott Avila, is in control of the company. The first thing we do is we file a lawsuit before the Second Circuit ruled on the Cohen appeal. We file a lawsuit seeking to reject that settlement and to get the money back. You didn't have to get to that because the Second Circuit didn't sustain Mr. Cohen's appeal. Exactly right. Wasn't that beneficial to the bankruptcy estate? I have said, and I've been quoted in papers, that what Mr. Cohen did was beneficial to the bankruptcy estate. So why not pay the man? We are willing to pay the man. And probably this is a case that applying this court's guidance in an opinion that it just issued would be a lodestar case. The lodestar case, you have to look at where the money comes from in this case that ultimately has been distributed to creditors. And by the way, this case, as opposed to most 10-year-old Chapter 11 liquidated cases, this case has been a home run. If you're willing to pay the man, has our mediator looked at this case? This case has been mediated by two federal magistrates. Has it been mediated by our Third Circuit? It has not been mediated by the Third Circuit mediator. We were here in April. We were before a different panel. And we discussed the possibility of mediation. We ended up thinking that mediation would not be helpful. We continue to have... It would be very helpful. I mean, you acknowledge he deserves a fee. He wants a fee. When you're dealing with money, it's a lot easier to come to a decision than when you're dealing with people or... Your Honor, I couldn't agree more. But sometimes there is the Grand Canyon between the bid and ask on a settlement. And that's unfortunately what we've had here. Over the 10 years, we've distributed money to creditors. We've paid creditors in full in this case with interest. There's going to be a dividend to equity in this case. A 10-year-old liquidating Chapter 11, that just doesn't happen. So this case has been miraculously positive. This is really the last material matter that the debtor and the recovery trust are dealing with in the case. What is a fair recovery when there has been a benefit, and you can't figure out whether the benefit created a common fund, what the benefit did to the common fund. You do what you do in bankruptcy cases. You look at how many hours the attorneys billed. You look at what a reasonable hourly rate is. And you pay the attorneys, just like you pay the estate professional. You pay the objector the same way. You pay them their load starting. So isn't it true that the bankruptcy court could still pay in this case? Absolutely. Don't you listen to the judges too who say this damn thing ought to be settled? Your Honor, I couldn't agree more. I make it a practice to listen to judges, especially circuit court judges. But this case has just not found a way to put a bridge over a big canyon. We have a very good mediator on the Third Circuit who has brought irreconcilable parties together. Your Honor, if you asked my client my recommendation, and I trust my client especially who is in court today hearing this, would follow the recommendation, we would absolutely be willing to mediate this case. So your client is here today? Client is here today. And he's the chief restructuring officer. He's the decision maker. He is the decision maker along with oversight committees of the recovery trust and oversight committees of the debtor. So the recovery trustee and the debtor representative don't operate without oversight. They've got to go to their oversight committees, make recommendations, get the blessing of those committees. So that's our quote-unquote corporate structure. I get the structure. Yeah. And that's not any typical structure in a case that is reorganized. The only thing atypical about this case is we've paid creditors in full and are going to provide a dividend to equity. But if we were unable to successfully mediate this case and to get it resolved, would we be saying in the bankruptcy court that there was no benefit? No, we wouldn't be saying that. But what we're saying here today is a little bit different than what we have to say at a bankruptcy court, which goes to the point of are we done today if this court makes a ruling? No, we're not done. Are you going to get in the way? So you're not going to get in the way in the bankruptcy court? You're going to admit that what Mr. Sesser and his group did was beneficial? It was. Make that representation to the bankruptcy court. We've made that representation to the bankruptcy court. We made that representation back in 2010 to the bankruptcy court. There was a benefit created by what they did. The question here today is not whether there was a benefit created by what they did, however. That would be a question for the bankruptcy court to decide when the bankruptcy court has to decide on their fees, which has to be done. Frankly, whatever happens here today, the bankruptcy court is going to get the fee problem and have to deal with it. Ultimately, our position on the fees is that, yes, there was a benefit. No, there wasn't a common fund. The reason we're opposing this appeal is they sought, based on everything they did in the bankruptcy court and everything they did in the district court, they sought a recovery based on a common fund. So that's why we're here today. There wasn't a fund in 2015. Again, we argue there wasn't a fund now. The question is not whether there was a benefit. The question is whether the bankruptcy court exercised his discretion properly in making the fee order that he did. And frankly, the standard is in this court of using discretion. It's a fee order. So your honors, the other issues in this case, there are two issues that are final. One is the issue with respect to the $1.5 million that was paid as part of the financing to counsel for the class as part of the 2015 settlement. And that $20 million loan that was made out of which the $1.5 million fee was paid, that was a financing provision that was non-recourse, that had no interest, that didn't have to be paid back under certain circumstances. In fact, the loan was ultimately forgiven. And it cost $1.5 million rather than $15 million, which is uncontroverted evidence would have been the cost of the loan if we went to outside financing. So that's final. That's a settlement. It's reviewed under abuse of discretion. That should be upheld by this court just as it was by the district court. Your honor, I see my time is coming to an end. Unless the panel has other questions, I would submit. Is your client available today to meet Mr. Terragrossa? He would be. Thank you. Thank you. First of all, I have those citations of the cases. Can I talk settlement? Sure. Let me just. You available today to at least get an appointment with Mr. Terragrossa? We are available. We are available. I know that Mr. Kornfeld made reference to the bid and the ask in the Grand Canyon. You don't want to hear the numbers. Every case has a bid and ask, but I think everybody would be well suited to follow up on Judge Ross' suggestion that this case should really settle. We're not opposed to a settlement. We discussed settlement within the last week. So we're not opposed. I think our client's here. My law firm representative is here. So we're all here. We're happy to do that. I should make a couple of comments on the presentation. One is it is absolutely untrue that when we made our fee application in 2015, that it was entirely on a basis of a common fund. What happened was we put in a fee application with all the requirements of a fee application, timesheets, description of services, everything we had done up to that point, and it was about $1.8 million at that point. It's now at least double that, but at that point it was about $1.8 million. We also had this claim out there, which the SEC had, but which was stayed. We had no choice regarding the timing of our fee application. I mean, we didn't have the luxury of waiting around to see if anything ever happened with the SEC claim. So this was our opportunity to put in a fee claim. And what we said is, all right, look, $1.86 million is 1% of that claim, which takes into account the speculative nature of any recovery. I mean, obviously if there had been a recovery of $186 million that went to the debtor, we would be in line for a much larger fee than that. What about Judge Fischer's questions about Third Circuit precedent supporting your position? Yes. The cases in there, I think, are on pages 9 to 12 of our reply brief. And starting at page 12, that's a Second Circuit matter in our very case where an objector had been awarded fees for, I think, improving the notice. And in our main brief, starting on page 27 in our main brief, cases where objectors. In fact, this would be in the event that the court, the trier of fact, determines as a matter of fact that there is no recovery on account of SOX, no funds received by the debtor. This will be the first case that I am aware of. There is no case in which a successful objector has ever been denied fees. This will be the first one. And our position is we earned our fee in 2010. But it is certainly true that we would be entitled to a larger fee in the event that there was a recovery. But we were certainly entitled to a fee on the basis of vindicating the public interest. Because if if this court affirms the the message out there is going to be. If you if all you do is vindicate the public interest, no matter how important. And even if it's a case of first impression, you're not entitled to a fee. That the only thing that counts is if you bring money in the door. And I don't think that's the message that this court wants to send regarding the one point. Just a minute regarding the one point five million. The one point five million was arranging a 20 million dollar loan for from an escrow point. One is that escrow would not have been available to the bankruptcy, but for our appeal. And Mr. Kornfeld admitted that in 2010. The only reason those funds were available in the bankruptcy was because of our second circuit appeal. The proceeds of that 20 million went entirely to pay lawyers. The records show Mr. Kornfeld's firm received 12 or 13 million of that 20 million. And the balance went to other bankruptcy lawyers and professionals overwhelmingly. So that's where that 20 million dollar loan went. And the one point five million was a gift to the class action lawyers who lost the appeal that we won. And who sought to undermine the public interest, but nevertheless were allowed to keep all of their fees while we got nothing. This was this paid for their bankruptcy lawyers who were defending their fees against a clawback claim. That's so that's the background there. And then in terms of do you have to bring in money in order to merit a fee? We understand your position on that. Thank you very much. Thank you. So I'm going to ask you folks, Judge, Joe Terragrossa's office is right down the hall. So I'm going to ask you to take your respective principles and make an appointment to have serious discussions with Mr. Terragrossa. And I'm going to also ask that you advise us in, say, two weeks as to whether this may lead to fruition. Does that make sense? Yes, Your Honor. That will work for you? Sure. Thanks.